May it please the Court, Davina Chen, this time on behalf of Terry Lee Franklin. I'd like to start with the search issue in this case. Under the Fourth Amendment, a warrantless search is per se unlawful, and the government bears the burden of proving its legality. Here, the government argues that the forceful, high-risk felony stop of Mr. Franklin was lawful because the officers received a dispatcher's report that the car had been reported stolen to the Rialto PD, and that this gave officers reasonable suspicion that Mr. Franklin, by virtue of his relationship with the car and his reaction to the officers, was both involved in a crime and was armed and dangerous. Let's be clear. The government argues that the dispatch, without any underlying facts, was sufficient to establish both reasonable suspicion that the car was stolen and that anyone associated with that car was armed and dangerous. You know, if this were a 1983 suit for excessive force, I understand your argument. This, however, is a motion to suppress the passport. Yes. And what does the fact that excessive force to stop him might have been used have to do with the fact that they ended up getting a passport as his means of identification? Because the police have the right to stop him. I mean, he's there next to a vehicle that they think has been told is stolen. They tell him to stop. He doesn't stop. They stop him, maybe too forcefully. I'll grant you that for purposes of my question. Then they ask him for identification.  So the crime is the passport. So what's the connection that allows suppression of the passport to what happened? Well, Your Honor, the connection is that, first of all, it's not clear that there was reasonable suspicion to even stop him, given that there are no facts in the record as to the underlying facts regarding the stolen vehicle report. There are no facts about that. And on that issue, Robinson is directly on point. Simply a dispatcher's report that a car is reported stolen is not even sufficient to make out reasonable suspicion. Now, the excessive force issue. The excessive force is what elevated this stop into an arrest. If someone is walking towards a car that may or may not have been reported stolen, sees the police, this is a black man, sees the police, doesn't want to be involved in whatever the police are surveilling in the car, and turns around, that is not enough to make out reasonable suspicion, let alone probable cause. Then they tell him to stop. It's undisputed that they were behind him when they told him to stop. And for all we know, he thinks, well, in fact, he did say, that he thought they were asking the driver of the car to stop. So that doesn't give rise to reasonable suspicion, let alone probable cause. Well, wait a minute. This is now his declaration. He says, I heard them say stop. I wasn't sure they meant me. I turn around and say, who, me? And they say, yeah, you, stop. And he doesn't stop. I mean, that's his declaration. No, I don't think that that is his declaration, that he doesn't stop. I think that he does stop when they say, yeah, you, stop. That is when he stops. But isn't there a little predicate to this? I mean, you've got a car that they think is stolen, and it's sitting there running with nobody in it. That's kind of the setup to begin with before all this happens. And Officer Zabel says that it would be highly unusual for a stolen car to be running with nobody in it. So that actually cuts against the finding that this is a stolen car. She said she'd never seen something like that before. Now, again, stolen car. How is this a stolen car? In Robinson, this Court held that if dispatch says there's a stolen car, that's not enough. We need to know what the stolen car report was. What if the stolen car report was ferries came to me and said they were going to steal my car? I see my car sitting in my parking lot, but I believe my car's been stolen because the ferries told me. That would not give us reasonable suspicion to stop someone for a stolen car, right? We have no facts in this record as to what the evidence was, what the information was that this car was stolen. So the fact that dispatch said it was a stolen car doesn't mean anything? It means that if the government had put on the information underlying it, that would have meant something. At most, it's an uncorroborated anonymous tip, right? This Court's case law is quite clear. If there's a conclusory statement in the record that a car is stolen, it's just conclusory. There's no information about it. Then that is, at most, an anonymous tip. And then we need to have prediction, predictive information that's corroborated. Here, there was no predictive information that was corroborated. All is that it's a stolen car. The car was running with its lights on. What we have from the record is the officer saying that that is unusual for a stolen car. We have that it has no license plate. Well, the car that was stolen, that's the one thing that is in the record. That car had no license plate. And then we have someone walking towards it saying, and turning around and going back. That is evidence that this person did not want to mess with the police. It is not evidence that a car was stolen, let alone that Mr. Franklin knew the car was stolen. So they didn't have a basis even for a Terry stop? No. I mean, they didn't have basis for a stop because under Robinson, the government It was the government's obligation to put on the underlying facts. I mean, Robinson is on all fours. In Robinson, a dispatch report goes out saying that such and such a car is stolen. The officers testified that they believe that that dispatch report came from the agricultural inspection station. I don't remember what they thought. I think it was the agricultural inspection station. But the inspectors who reported the car had been stolen, and the dispatcher did not testify. So the only evidence in the record was that there was a report to dispatch that a car had been stolen. And the report itself does not justify the legality of a stop. There has to be something underlying that report. And in this case, there was nothing underlying that report. There may well have been something underlying the report, but the government chose not to put it in. In fact, not only did the government choose not to put it in, the government said that it was irrelevant. At ER 509 and 510, at the suppression hearing, the government says, Whether or not they had the time sitting at the scene of this dangerous event to start inquiring of someone back at the station to read through what is a very lengthy report, to report that, to trust that account and somehow have that impact their view on the ground as far as what their conduct should be. So in other words, the government's argument was they knew that the car was stolen. Any facts surrounding the report of the car stolen are totally irrelevant to their view of what's on the ground. What we're saying then is that once you report a car stolen, the government is allowed to treat anyone who's related to that stolen car as armed and dangerous, even if the report says it's not really stolen, I lent it to my boyfriend who lent it to a friend. The government's argument is that is not relevant. They say it again at ER 510. And to say that they should review and then somehow suggest that the officers should rely upon it and not act as they would given what they believe to be a dangerous situation. So let's back up. They believe this to be a dangerous situation because they believe that a car has been reported stolen. They have no information as to, and the court had no information. Let's set aside what information they had because, of course, we know under the collective law. Let me ask about some other information I was curious about that I didn't see and maybe you know about something that I don't in the record, probably do. But anyway, what was the size of Mr. Franklin? How was he dressed? Was he loose clothes, tight clothes? Baggy clothes. Baggy clothes? Baggy clothes. That's what I understood. How big is he? I don't know, Your Honor, because I didn't represent him below. It's probably in the record. I'm sure that in the passport documents it probably indicates and probably Mr. The passport may describe the other guy in terms of height. I don't know. But in any event, we don't know. But certainly being big and wearing baggy clothes isn't sufficient to do a full take down. Well, frankly, it does make a difference in terms of what you think about for your threat. I've had a case where a great big guy got stopped. They did a pat down on him. They missed a handgun underneath his arm. He was a big guy in baggy clothes. Right, but this is a big guy in baggy clothes, and all we know about him is that he was walking towards a car and then he turned around the other way. If you have reasonable suspicion to do both the stop and the frisk, then maybe the size, I'm still not sure that the size matters, but maybe it does. But in this case, you don't have reasonable suspicion to do the stop. You certainly don't have reasonable suspicion to do the frisk. So his size, I'm sorry, but I don't see that it's relevant. What we have here is the government claiming. This is why he's armed and dangerous. Okay? This is it. A car was reported stolen, but we know nothing about that report, and it's irrelevant. Okay? It's irrelevant, so we're not even going to put in any information as to why the car was reported stolen because we have deemed that to be irrelevant. Okay, a car has been reported stolen, but we don't know anything about the circumstances, and we find those circumstances irrelevant. Somebody is walking towards the car, sees the police officers who are watching the car, not him, right? They're watching the car, and then he turns around and walks away. And gives an oh, shoot look. He gives an oh, shoot look, right? Because this is an African-American man in an African-American neighborhood, and he sees police officers, and he doesn't want to be involved. That is okay. If you see an incident on the street, and it looks like your friend might be about to be busted, you are not required to go and offer yourself up. Probably you don't want to be involved in whatever is going on, so you turn around. You give an oh, shoot look. You don't run away. You don't sprint away. That's your side, but on the other hand, the police officer's side might be, hmm, here's a person of interest. Yes, but that's why we have a Fourth Amendment, right? We have a Fourth Amendment so the officers can't just say, oh, there's a person of interest. Let's do a full takedown on him with guns, handcuffs, holding his arm behind the back, proning him down, right? We don't do that to a person of interest. Well, if this were a 1983 suit, I would understand why all that is relevant. But this is a suppression motion, and we've got the district court, it's not written findings, but it's oral findings. It says they had reason to stop him for a Terry stop and reason to frisk him. So for that purpose, why is it relevant that they might have used excessive force in making the stop? Well, it's relevant. Well, first of all, I disagree that there was reason to stop him. But the district judge heard the evidence and made a finding. Right. So this district judge agreed with you. We're not doing this based on my evaluation of the affidavits. I've got a district judge who heard this evidence. I understand, but the district court's finding is directly contrary to Robinson. Well, it has to be clearly erroneous, doesn't it, for us to do anything about the district court finding? No, reasonable suspicion is a legal finding. It's reviewed de novo, okay? And so there is no reasonable suspicion when there is zero evidence in the record that the car was stolen, okay? First of all. Wait a minute. What if they have in their possession a report that it is stolen? Does that mean there's no reasonable suspicion? If it can be shown afterwards that it turns out that it was not? If they have in their possession a report that actually makes out reasonable suspicion that it is stolen, that is relevant. That is not in the record. Well, they've got something that tells them it was a stolen car. That's why they're surveilling the darn thing. Right, but that's exactly the same as it was in Robinson. In Robinson, there was a report that the vehicle was stolen. The government chose not to put the underlying facts into the record. Under the collective knowledge doctrine, it's true. You absolutely look to the knowledge of all the offices. So if it turned out that the Rialto Police Department had reason to believe that it was stolen, even if it turned out later that it wasn't stolen, if they had reason to believe it was stolen, then that's a lawful stop. We have no reason to believe that the Rialto Police Department had reason to believe it was stolen because the government chose not to put that on the record. So we have a stolen vehicle report with no underlying facts. Well, wait a minute. How much evidence does the government have to put in that police are saying we had a stolen vehicle report? I mean, that's evidence. Well, it's exactly the same as Robinson. In Robinson, we have a report that a vehicle was stolen. And because the government chose in Robinson not to put on either the person who reported the vehicle stolen or the dispatcher who got the report and then relayed it, this court held that the government didn't bear its burden. Under the collective knowledge doctrine, we look at what all the officers knew. And I absolutely agree with you. If the Rialto Police Department knew, had reasonable suspicion that the car was stolen, then these officers would have reasonable suspicion that the car was stolen. But we have no evidence as to what the Rialto Police Department knew because the government chose not to put it in the record. So, first of all, on all fours, but I keep on getting sidetracked because Judge Fletcher is asking a question about whether this is a 1983 suit or... Which it clearly is not. Right. So the reason why the amount of force that is used is relevant is because that is how you determine whether something is a stop or an arrest. If it were only a stop, I argue that there's not reasonable suspicion for that. If it's an arrest, the government can see there's no probable cause in this case. So the amount of force that is used is relevant to determine whether this was an arrest or a stop. And I would submit to you that when police officers point a gun at somebody, grab them by the arm, force them onto the ground prone, put handcuffs on them, leave them there for two to three minutes, which is what the record in this case requests, that is an arrest. The only possible way that is not an arrest is if the officers had particularized suspicion to believe that this person is armed and dangerous. Okay, those are bad facts. I mean, good facts for your argument, but bad facts for the government. But the fact is that if they'd had a Terry stop and didn't do what might well be an excessive force thing, if they'd just done a Terry stop and needed to pull out his passport as a result of the Terry stop, what would you have to talk about? But he didn't. Those aren't the facts of this case. He was handcuffed at the time, his passport. I know, but you want to take the bad facts and add them on, but I don't think the bad facts make any difference. But if this wasn't a Terry stop, I mean, if this were a Terry stop, first of all, they didn't have grounds to do a Terry stop. Because they had no reasonable suspicion. The government hasn't proved they had reasonable suspicion. Well, that's your position, but... Well, that's the law of this circuit, is that they don't have reasonable suspicion unless the underlying facts. A report standing alone does not make out reasonable suspicion. No, I understand your position. Okay. So second, though, is that under Hensley and Whiteley v. Warden, the officers who performed the stop cannot be more intrusive than the officers who ordered the stop. Okay? So even if we believe that there was a stolen vehicle report in this case, which there is no evidence that there was, they can only do what the people who issued the report. And we don't even know what that is. Right? The government has not even, has not put it in, so we don't know what it is. The government bears the burden of proving that this stop was not more intrusive than a Terry stop. And I submit to you, that is not a Terry stop. When you take somebody down like that, that's not a Terry stop unless you have reasonable, you have particularized suspicion that that person is armed and dangerous. And there is no particularized suspicion. That is the law of the Supreme Court, and that's clearly the law of the circuit. What you look at is the degree of force in relationship to the reasonable suspicion. And in this case, the degree of force was very high, and there was no reasonable suspicion to support that degree of force. Did you find it? It looks like you're looking for something in the record. I'm just skeptical of the argument that the degree of force has anything to do with the motion to suppress. The question is, was the stop justified? That is to say, did they have reasonable ground, a reasonable, an appropriate legal basis to say to Franklin, stop, and when he didn't stop, to make him stop, and then to get his identification. And if they used excessive force, they used excessive force, and that's a 1983 suit.  But the excessive force, the court doesn't feel that the excessive force turned the stop into an arrest? And so why do I care about that? Because if it's an arrest, it's not supported by probable cause. But why does it need to be an arrest? So if it's not an arrest, so what? If it's not an arrest, then he wouldn't have taken the passport out of his pocket. That would have been a search incident. The government's argument is that after they did the Terry stop, and they did the pat down, which again, I submit they are not authorized to do the pat down, they found marijuana, and at that point they had probable cause to arrest, and so they could seize his passport. But they would not have been able to seize his passport if this were just a Terry stop. He didn't offer up his passport. In fact, they tried him on the theory that he offered up his passport, and the jury did not convict on that grounds. In fact, they sent out a note saying if we don't believe that he offered up his passport, what do we do? So this is a case where the passport is a fruit of the unlawful, whether you call it a stop, an overly forceful stop, or an arrest. The passport was seized, and it was a fruit of that stop. I see that my time has expired for now. Good morning. My name is Michael Doerr. I represent the United States. I wanted to build on something my colleague had addressed in the Dong case with respect to the motion to dismiss, or otherwise I could address the suppression issue first, whatever the Court would prefer. Why don't we stay with the suppression first, if you don't mind. How do you get around Robinson? Your Honor, I don't think Robinson applies here at all. He does? Robinson is distinguishable because there the officer had no personal knowledge of any facts giving rise to reasonable suspicion. And did these officers have personal knowledge? Absolutely. What's their personal knowledge? Their personal knowledge is that they come upon a car having gotten a lojack signal, which they submitted in their declarations reflects that a car has been reported stolen. But that's what the case was in Robinson. The officer has a report of a possible stolen Oldsmobile. The Oldsmobile identified the report that came to him, comes by, and he stops it. So how is this case different? I see that being different, Your Honor, in that you get a lojack signal as an objective suggestion that there is a car that has been reported stolen, whereas Robinson involved secondhand information saying from some unidentified evidence. Maybe I don't understand lojack. Describe lojack, how that works. Lojack is a car which has a lojack transmitter inside of it. When the car has been reported stolen, gives off a signal, which the police can then see that signal. So these officers, Urdeli and Megan Zabel, while driving around Long Beach, had a ping on their lojack signal. And so it's true that the origin of that signal was a report to the Rialto police department. But that is an objective indication that the car itself is stolen, separate and apart from that. But they have no independent knowledge that it was stolen. And it may be that Robinson is bad law. It was written a long time ago by a very well-respected judge. But there was a dissent. I mean, it's a 1976 opinion by Judge Huffstetler with a dissent. I don't know if it's still good law. But it's Ninth Circuit law. It hasn't been overruled. So, I mean, I think I've got to follow it. What happens there is the officer there has a report of a, quote, possible stolen vehicle, identifying the vehicle. And the officer is not, the search is not allowed because the court says, well, they had to have some independent knowledge. The government had to put something on further. And the government didn't do it. Here's another reason why I think Robinson is distinguishable. The only reason that cop in Robinson pulled over the car is because he had been told secondhand that they thought it was stolen. There's no indication in that case that it was. But lojack sounds to me like secondhand. Well, separate and apart from that, you've got an empty running car sitting in the middle of the street. It is a brand-new car. It's a 2006 Honda Civic. This is December 6th, 2006. And black people don't have new cars? It has nothing to do with that. So why is it? It's relevant to people. Right. Because I don't think, rather than it being some broken-down car, it's unlikely that someone is going to leave their brand-new car sitting in the middle of the street with the engine running, nowhere in sight, if it's their car and they care about who owns it. I think that is a suspicious, that is a weird situation that the officers have right to investigate when you've got a valuable automobile sitting, running. You know, the car, the engine is running, but no one's inside of it. That is an odd situation. Were the doors open on the car? I don't recall there being anything in the record as to whether the doors were open. The lights were on. The car had no license plates. Officer Zabel, who went to identify the VIN number, saw an individual walking into an apartment building. But then, otherwise, there was no one around. And so you've got a car sitting there, running. And it's a new car. And I only say that because I think that suggests the car is valuable and that if  of the ignition. Further, the fact that the car is running suggests that there's some degree of exigency. Why are people not taking the time to turn off the car? It's sitting there in the middle of the street. I think that gives the officers reason to investigate. Now, you say in the middle of the street. Was it in fact in the middle of the street or was it over at the curb? At that point, I believe it was over at the curb. In the middle. Okay. Stay with your facts. Fair enough. It's sitting in the street at the curb, but the car is running and no one's around. And, again, that's why I think the new car matters. Separately, so I think there are independent facts from whatever is related. How do the officers know the car was running? I think that when Megan Zabel walked up to the car to identify the VIN number, she was in position to tell that the engine, in fact, was running for that car. She went up right to the car. I have a car, and I can't tell whether it's running or not. I mean, you know. Fair enough. Officer Zabel at this point. I bought my first new car. It's a Lexus. But their hearing is probably better than yours. No, no. My hearing's good. My hearing's good. I've got my hearing's fine. And so were the lights on? That was the testimony of Officer Zabel, yes. Was that night? No, this was during the afternoon. Okay. But, yeah, when they're running, the lights go on automatically. I think that's a fair inference, Your Honor. What? I would agree with that, but obviously Officer Zabel, who had experience, could tell that the car was on. Did the officers see anybody get out of the car? No. They came upon it. They had received the low-jack signal. They had tracked it, so the car had been moving. And they came upon it after it had stopped near the intersection of Eagle and Pine in Long Beach. When Officer Zabel got out of the police vehicle to walk up to the car to see if the VIN number, the vehicle identification number, matched up with what had been reported stolen, she walked up to the car. She then saw someone walking into an apartment building. Why should we know the car was reported stolen? Because the low-jack signal, when the officers report the low-jack signal, they receive information from dispatch indicating the vehicle identification number of the vehicle that had been reported stolen, as well as the make and model of the car. But why wasn't the reluctance to turn over the paperwork on the car? There was no reluctance whatsoever. This issue never came up in the district court. The Hensley case, the Whitley case, this Robinson case was never raised. There was a reference in the suppression hearing by defense counsel to the fact that the officers arguably had time while sitting on the scene to read the report, which at that time, my view was that that was not relevant for various reasons, one of them being that they had no idea who was getting into that car at that time because it was sitting empty. They further had no idea what someone may have been doing in the apartment when the person presumably had no time or for whatever reason did not bother to turn off the car while going into the apartment. Wait, did they see anybody go in the apartment? Officer Zabel saw an individual walking into the apartment, was not sure whether or not that person was involved in the car. But when that person later exited from the apartment, Mr. Frederick Hunter, she recognized that as being the person she had seen going into the apartment. Their declarations, Officer Zabel and Officer Adeli, further indicated that these apartments, when it was in the context of whether or not the defendant was walking back to the apartment after the officers had asked him to stop, after Officer Adeli had asked him to stop, the possibility of there being dangerous, whether it's Confederates or money, not money, I'm sorry, or weapons or something, whatever it is, unknown in the apartment where an individual was going. Well, did it turn out that he was driving the car? Well, it turned out that Mr. Frederick Hunter was the person who got into the driver's side of the car, turned it around, and then sat that time in the middle of the street while someone else, the defendant, walked out and walked, approached the car, reached out for the car as a district courthold reflecting an association with the reportedly stolen vehicle, giving a discernible reaction to the officers who approached. What did he do? He gave an oh, shoot look. So the driver, the driver was in the car? That's right, at the wheel of the running automobile, yes, in the middle of the street. He put it in the middle of the street. The Mr. Hunter, nicknamed K-9 apparently, also MSB, whatever it was in the record, got into the car, turned around, was sitting in the middle of the street, according to Officer Adeli's testimony at the suppression hearing, with the car running. And it was at that point when the defendant walked out and approached the vehicle, reached out, the district court found he reflected an association with that car again, gave an oh, shoot look to seeing the approaching officer, turned around, started walking away, did not respond when Officer Adeli instructed him to stop, and that's when Officer Adeli brought him to the ground. And we think that, you know, separate and apart. But he put his hands on the car. No. Well, that's also another important point to leave you on. I think this should be looked at with a wider lens. As the defendant is walking away, as the Officer Adeli is calling after him, you have Mr. Hunter still at the wheel of this reported stolen car. Officer Zabel is in her car about ready to conduct the felony stop. So the further away Mr. Franklin goes, that expands the perimeter of the scene, of what we're talking about here, and further endangers her until there are additional officers who arrive. So the exigency of the situation, as reflected in the Allen v. City of Los Angeles case, which we cited, applies to the situation as a whole. It's not simply, you know, brick by brick, whether or not he walked at the car, what the defendant looked like, et cetera. You have an ongoing high-risk felony stop in the parlance of the Long Beach Police Department, and that was also a factor that the district court recognized in its findings with respect to the suppression motion. If I might just address one more point with respect to Robinson, again, why I don't believe it applies, Judge Fletcher. What really makes it high risk? Well, the fact that you have a felony reported stolen vehicle, and at that point, according to Officer Zabel and her testimony at the suppression motion, it was a felony in progress, a felony stop. The fact that there was a person at the wheel of that reported stolen vehicle who could drive away and leave the police on a chase. You also have Officer Adeli's testimony via his declaration and at the hearing that the officers take stolen car situations very seriously because, among other reasons, not simply how the car may have been taken, but that someone involved in that stop, as with any other stop, but particularly when you're talking about a felony, would have a record or a reason to try and avoid police or cause some risk or danger or threat to those police. And so based on Officer Adeli's conclusions and Officer Zabel, that's why they conducted the felony stop. And so that situation was an ongoing one while they were pursuing, I keep saying they, while Officer Adeli was pursuing the defendant who had just approached that same car and was walking away from it. So to simply let the defendant walk away at that point. When the officers arrived, the car was at the curb, right? Curb. I believe that's right. I don't have a record. It was at the curb. Yes. And how far was the car from the building that some person walked into? Your Honor, there were some maps attached to the declarations around page 330 of the excerpts of record and corresponding with the testimony. My recollection is that for all intents and purposes, the car was essentially across the street from this apartment building. And so it's parked across the street. The officers pull away to surveil the car. That's when Mr. Hunter got into the car, turned it around, made a U-turn in the street, was sitting in the middle of the street, again, this time on the side closest to that apartment building, at which point the defendant walked and approached the car. With – again, if I may just add one point with respect to Robinson. I mean, the court there said if the dispatcher himself had founded suspicion or if he relied on information from a reliable informant who supplied him with adequate facts to establish founded suspicion. Here, I don't think this is an anonymous tip. This is not some ill-defined, nebulous, relaying third hand of an agricultural inspector. You've got the Rialto Police Department, which have put in the LOJAC hit. I mean, that certainly, in our mind, raises to the level of a reliable informant. And I think that the defense's position here that the collective knowledge doctrine applies, which, again, is never raised below, is a further extension of that. We're talking about collective knowledge that hasn't even been established. And so there is no indication in the record. In fact, it was the defense that simply just misstated what information was within the knowledge of the Rialto Police Department. There's just no evidence of that. The only evidence is that the car was reported stolen. And further, when you've got officers sitting on the ground surveilling the car, to have them relying – and this is another thing that Robinson says specifically. So the police department got a report from LOJAC. And you say they relayed that report to all the vehicles? The dispatch, apparently, the long – Rialto Police Department is the one that took the reported stolen car. I believe that Rialto is the one that instituted the LOJAC notice. I'm not positive that's in the record as to how – who, in fact, makes that happen with respect to LOJAC, whether it's the victim who calls up the company or whether it's done via the police department. But then the officers who have a LOJAC signal receptor in their car can see that it's beeped. Okay, we're around a stolen car. They contact dispatch to determine what the car – which car we're talking about. And they confirm their signal matches up with the identifiers with respect to the car. But, again, as these officers – and there's one point that Ms. Chen raised, which I disagree on the interpretation. These officers are sitting there surveilling a car. And they don't know who's getting into it. They don't know if it's the same person who took it. And to have them rely on dispatch to review a report, to tell them, hey, no problem, it's fine, you – it's just not a given that that's right. And so you've got people on the ground – if I may finish this point. You've got people on the ground who are responding to the situation as it is presented to them. And I think the error in the dispatch is a telling one, where they say that the victim said that K-9 possibly had the car, itself not a certainty. And then two minutes later, dispatch corrects that to say that the cousin said K-9 may have the car. K-9 itself suggests something potentially that is an issue. But that discrepancy over the course of two minutes shows the danger that you would be asking – that one would be asking police officers to undergo if you are relying on a dispatch, which itself is coordinating the situation involving other people in the scene and other matters, to read through this and say definitively that the officers should have nothing to worry about. And I think that that's another thing that Robinson says, where it says effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers who must often act swiftly cannot be expected to cross-examine their fellow officers about the foundation of the transmitted information. The car may have license plates. The officer is able to testify that it – I'm asking you questions because whenever, you know, you buy a car these days, they want to sell you a low jack, you know. That's when they bring you into the room and pull down the shades and – Sure. They want to sell you something. Officer is able to testify that it did not have a license plate. In fact, that's why she got out of the car to walk up to the car to confirm the vehicle identification number. Did it have a slip on the windshield? There's – To show that it was a newly purchased car. Nothing in the record speaks to that issue one way or the other. Isn't that a distinction then with regard to Robinson? Because no license plate and no dealer plate is another indication it's a stolen car, separate and apart from the low jack signal. Separate and apart from the low jack signal. And, again, there was no indication of anything remotely suspicious in Robinson with respect to that car other than the secondhand information that had been relayed about the agricultural inspector's impression. Here you've got a situation which, similar to Terry, this is something that would give officers a question. It leads them to wonder what's going on. Was the name of the registered owner of the car anywhere in the car? Your Honor, the only thing with respect to the record as the registered owner is her being the one who reported the vehicle stolen and in the dispatch log her name was reflected along with the vehicle identification numbers. The police report afterwards when Mr. Hunter was interviewed by the Long Beach police officers indicated that he had gotten it from this woman's boyfriend because the boyfriend owed her money – owed him money. Which itself, if you're going to – if you're going to talk about the collective knowledge, if the report says that, that sounds like a shakedown. You've got a guy who's an admitted gang member saying that someone owes him money so he takes the brand-new car without the knowledge of the owner and then leaves it in the middle of the street. So what happened? The owner's boyfriend drove off with the car? No. The – apparently the owner's boyfriend had given the car to – at least this is – this was the claim of Mr. Hunter when he was arrested, that the owner's boyfriend had given him the car without the permission of the actual owner because the owner's boyfriend owed him money and Mr. Hunter's car was in the impound. That's what Mr. Hunter had told the Long Beach police officers after the event had happened. So I don't want to – I want to be clear. There's – I don't know one way or the other whether that was in the report. We just – we didn't have the report. But the defense never raised this issue. Why wasn't this information given to defense counsel? We never had it. This never came up as an issue as something – when they sent 13 Long Beach police officers to testify at the suppression hearing, they justified invoking their speedy trial late so they could pursue and investigate this case. They were equally able to obtain this police report. Defense – the government never had it. And the government, based on the separate reasonable objective circumstances, showing reasonable suspicion here, including the fact that the car was empty and sitting on the side of the street at the curb or in the middle of it. Either way, you're talking about a unique situation as officers able to testify, when she said she'd never seen something like that. And that justified the officers in pursuing the matter, seeing what was going on. You're saying that the information that was conveyed to the dispatcher was – and all the different bits of knowledge that was acquired by the police department, that was never asked for? Well, it was never – to my knowledge, it was never subpoenaed by the defense, nor was it asked for by the government. It was asked for. I never asked for it. Huh? I was trial counsel. I never asked for it. No, but the defense counsel asked for it. No. Defense counsel never asked for it. Defense counsel also issued numerous subpoenas, as I indicated. But apparently they never issued one to Rialto. And they never – again, they never raised this issue in the district court as far as collective knowledge. It never came up. And, you know, obviously if it had, we could have litigated it. We litigated the heck out of this case. Numerous issues. And so if that was an issue, then that was something they were perfectly able to raise and we were perfectly willing to address. Does the record reflect the experience of the takedown officer? Yes. Officer Adeli's declaration, which was at page – I'm sorry. It's page 328 of the excerpts in Volume 3. I believe indicated that at the time he had six to ten years of experience, including in that particular neighborhood. He was on a gang intervention task force. The first several paragraphs of that declaration speak in detail as to his experience. Thank you. Was there any – is there any evidence that the defendant here had any connection to this car? As the district court found, Your Honor, when the defendant walked up to the car, that – and was the immediate proximity of the car. I believe Officer Adeli had testified that the defendant was reaching out to get into the car, plus the fact, obviously, that the car was waiting for someone to get in. Those facts all suggested, and the district court found, that the defendant had an association with this reported stolen car. The what? The defendant had an association. He was associated with. He had some connection to, some tie to, this reported stolen car. Your Honor, I know I'm way over time. I just wanted to mention one point. The – I think with respect to the motion to dismiss, there are cases from other circuits. The Fifth Circuit case from Villa Real, page 29 of our brief, cites that case. Look v. Amaral, which is from the First Circuit, all talking about how prejudice can be required. The Fifth Circuit case specified five years as a benchmark in cited cases for doing  Also, I just wanted to raise the Beeman and Gregory cases, which we cited on that same page, where there were periods of negligence of 22 months, 17 months, and 20 months, in which the Ninth Circuit found that a showing of actual prejudice was required. Thank you. Your Honor, the government has argued that the collective knowledge doctrine is totally irrelevant here. But the collective knowledge doctrine is the only doctrine by which they can make out any showing of reasonable suspicion. This Court has held very clearly, as has the Supreme Court in Whiteley, in Hensley,   this Court in Robinson, in Morales, in Thomas, in Cervantes, this Court has held repeatedly that a stolen vehicle report or a report of illegal activity standing alone without the underlying facts does not justify a stop. So if the collective knowledge doctrine doesn't come into play, all we have is the stolen vehicle report. And we know nothing about the underlying facts. So again, under Whiteley, under Hensley, Judge Fletcher asked if Robinson was still good law. Robinson was, in fact, cited by the Supreme Court in 1985 in Hensley. Under all of these cases, the collective... Well, it's clearly good law. It's not been overruled. It may not be good law outside the circuit, but it's binding on this Court. I think it probably is good law, but it's certainly binding on this circuit. So if the government's argument is the collective doctrine, knowledge doctrine, or the fellow officer rule doesn't apply at all, then there just simply isn't reasonable suspicion. All they had was someone else saying the car was stolen. The law is very clear that that is not enough. Someone else saying the car was stolen isn't enough. We need to know the issuing department. We need to know what they knew in order for Officer Ardelji's actions to be legal. It's interesting that the government quoted from Robinson, but they didn't quote the next sentence. It's true that a facially valid direction from one officer to another is enough. Because, of course, you don't want the complying officer to be cross-examining the issuing officer. You don't want that situation. But the next sentence in the case is, but the direction does not itself supply legal cause for the detention, any more than the fact of detention supplies its own justification. So the fact that they were acting on the orders or the report of someone else would immunize them, possibly, from liability. But it doesn't make the stop legal, because we have no information as to what the information that the issuing department had. The government argues that even if this wasn't a stolen vehicle situation, we would have enough. But really, it's zero plus zero equals zero. What we have is a car stopped at the curb with the engine on. So what we know is that somebody's in a hurry. That's what we do when I'm late for work, I leave the engine on. So what we know is that. Then it's supposedly suspicious that somebody's walking into an apartment and then walking out of an apartment. Well, that's exactly what happens when you're in a hurry, right? You run into the apartment and you say, I'm waiting downstairs, and you run back out of the apartment. So we have someone who went up to the apartment, came back down to the apartment, got in the car, did a U-turn, so now he's waiting for the person who comes out of the apartment, which is my client. None of this is suspicious. In fact, Officer Zabel was quite clear. She had never seen a stolen car in that situation. Not that she had never seen a car in that situation. All of us have seen cars in that situation with the engine on. So the person gets out of the car, they go up to the apartment, they tell whoever, I'm waiting for you downstairs, the engine's running, I've got to go. They come back in, they get in the car, they make a U-turn, our client comes down, he's about to get in the car, I don't dispute that he was about to get in the car, and he sees, oh my goodness, it's surrounded by police officers. Who wouldn't go, oh shoot, and turn around at that point? Who wants to get into a car that they see is surrounded by police officers? So he makes an oh shoot, and he turns around. He doesn't run. When the officers say stop, he doesn't run away. He just continues walking the direction he was already walking, and that's when the felony takedown occurs with him. And then, returning to Judge Fletcher's point, again, about why does any of this matter, I think I want to make it very clear that this is a possession offense. He was convicted of two possession offenses, possessing the passport, and then the 1028A in relation to possessing the passport. This is not a use offense. So this is not a case where we're arguing that somehow his use of the passport is suppressible. It's the item itself that would have been suppressible. It was seized out of his pocket when his hands were still cuffed. It was seized out of his pocket, and so it was clearly a fruit of an unlawful, whether you call it an overly forceful stop or an arrest, it was a fruit of an unlawful stop. Again, I submit that even a stop is not lawful if the government's view is taken, which is the collective knowledge doctrine doesn't apply at all. So we have no reasonable suspicion whatsoever to even stop this person, but certainly not reasonable suspicion that he's armed and dangerous to do a full takedown. I heard it. Thank you. All right. That concludes this calendar, and this court will adjourn. Thank you.
judges: Piersol, Pregerson, Fletcher